Good morning, Your Honors. Gerard Mantis, representing the plaintiffs. I'd like to reserve five minutes and I'll watch the court's clock. Very good. I'd first like to emphasize two overarching points. One, this is a pleading dispute as the case was dismissed under 12b1. Plaintiffs did plead sufficient injury if the trial court failed to assume all facts as true or give plaintiff the benefit of all reasonable inferences. And two, FHA claims are subject to a very liberal standing requirement, Harris v. Itshaki. Application of these two principles alone should have led to a different result alone. Here, plaintiff's third amended complaint alleged facts sufficient to support standing for three independent reasons. First, we plead that Facebook excluded plaintiff Vargas from seeing housing ads available to white counterparts based on her status of being Hispanic, disabled, female, and with children. All right. So, counsel, let me just jump in because I think we need to be specific about the complaint. That's the problem that Judge Orrick had. Are you referring to paragraph 95 of the third amended complaint? Pardon me. That's the paragraph that says she sat side-by-side with a Caucasian friend and got different hits. Yes, Your Honor. I'm referring to paragraph 95 and 96, primarily 95, yes. Okay. Go ahead. I just want to make sure we're all talking about the same thing. Second, Facebook gave false housing information to plaintiffs based on their protected status, and that Facebook represented, first, that housing was not available when it was, and, two, that Facebook represented that it did not allow discrimination, yet it did. Third, plaintiffs have standing because they allege that Facebook created a segregated marketplace, segregated housing marketplace. So if these pleadings had been accepted as sufficient, then this would have been – this would have supported standing under the case law. So let me ask you this, counsel, because I agree with everything you said theoretically, I should say. But I believe Judge Orrick's problem with the complaint was he said that in paragraph 95, which I think is your best paragraph, that's your best argument, is that, for example, it didn't delineate between the paid and unpaid ads. Because my understanding is your theory in this case is that Facebook provides a service that you can pay for and you can toggle effectively who you want to target in your ads, correct? Yes. Now, in paragraph 95, it says, the last sentence, Plaintiff Vargas did not receive the ads that Ms. Marcello received. But I think Judge Orrick's problem was that it doesn't specify that the technology in question here was the cause of that. And can you speak to that? Yes, Your Honor. We know from paragraph 76 of the third amended complaint that Facebook began placing targeted ads when a user uses Marketplace. So giving plaintiffs a fair inference, the inference would be, or the conclusion would be, received paid housing ads which were fewer in number and less desirable than her white friends sitting right next to her. Well, yes. And I would just say the remaining allegations, including paragraph 100, deal to some extent with causation. Yes, Your Honor. Yes, I would agree with that. So, again, the first way plaintiffs pled sufficient standing was by pleading actual exclusion from seeing ads. And it was error to require Vargas to plead specific housing that was withheld from her. That wasn't required in Havens. In Havens, there was a tester, so someone not even looking for housing, was excluded from available apartments without, and she established standing without identifying specific housing that was available to her. So for that basis alone, standing was shown. Second of all, there was an alternative basis for standing that the court did not deal with. Under Havens, if a member of a protected class is given false information about housing, that's standing. In Havens, a black tester had standing under the FHA against an apartment owner who lied and said no housing was available. Well, here we have two misrepresentations by Facebook who's operating a much larger housing marketplace. First, it communicated to Vargas that only certain housing ads were available when this was false, as Marcello's identical search revealed that more housing was available than communicated to Vargas. Second of all, Facebook communicated to the world that it did not allow discrimination. That's in its own policy. But this, too, was false. Facebook didn't prohibit discrimination. It implemented it. It was the architect. Well, it facilitated it, which is not quite the same as implementing. Your Honor, here Facebook's conduct was so invasive, it created the illegal tools and it allowed. Right, that's facilitation, no? Well, Your Honor, I would say it also effectuated the discriminatory exclusions through its sophisticated ad delivery system. So I would say it was the excluder. It barred the doors to protected classes. And I would note that a third reason that plaintiffs have standing is because they alleged that Facebook created a segregated marketplace, and that was sufficient in trafficante where one black and one white tenant were held to have standing when they were challenging the racial steering practices of a landlord, and they alleged that they lost the social benefits of living in an integrated community. Now, I would say alternatively, if none of these showings of standing is accepted, reversal is still warranted to allow plaintiffs to conduct jurisdictional discovery. We asked for limited jurisdictional discovery on several occasions, many times at oral argument, in our brief opposing dismissal, and in our third amended complaint. The district court set an impossible standard. Produce the ads you didn't see, but you can't have discovery about those ads. And that was an abuse of discretion. Turning to 47. Actually, let me ask you about the discovery real quick. What would you be seeking? Let's say I read that paragraph 95 and say, you know what, I need more of a tie to the paid ads. What jurisdictional discovery would you be looking for that would answer that question? Basically, what would a fourth amended complaint look like if you got the jurisdictional discovery you wanted? We would show which paid ads were communicated to Ms. Vargas. Facebook has massive servers, and it stores millions of data bytes on all of us. So we would have that information from Facebook's servers. We would show which targeted ads. And Marketplace is an ideal place to present targeted ads, because they know those people on Marketplace looking for housing want housing. So that's the best place to deliver or exclude ads. And so it makes sense in giving us the benefit of reasonable inference that Vargas had paid ads excluded from her, because her white friend saw more ads than she did with the identical searches. And Facebook was, in effect, trying to try the case. Even the transunion case it cites examined standing after discovery, hearings, and a trial. This is a pleading issue where we should have given the benefit of the doubt, and that was not done here. Turning to Section 230, Facebook is not protected under Section 230, because it is not being held liable solely for the postings of another. Here, Facebook co-created content and supplied illegal, not neutral, tools to exclude. It provided the option to housing advertisers to exclude women, families with children, and on and on and on. It even provided a toggle button that allowed you to draw a red line around a geographical area to exclude people from that area, giving new meaning to redlining. It, in effect, said, if you want to discriminate, click here. And the court in Daniel v. Armless said it well. Quote, it is perfectly legal to discriminate along those lines, referring to sex, race, and sexual orientation, in dating. In contrast, filters based on these characteristics have no lawful use in the housing context. So they are not neutral tools in the housing context. Stated otherwise, the filters can only be used for unlawful purposes in a housing context. Second, Facebook mines the protected characteristics from its 2 billion users. For example, Paragraph 42 of the Third Amended Complaint says, quote, Facebook collects millions of data points about its users. Then Facebook uses this information to block ads to the protected classes with its sophisticated algorithms. It knows everybody's race, religion, sex, national origin, age, et cetera, and it effectuated the discriminatory exclusions. So its conduct here was much more invasive than the conduct of the defendant in Roommates, which was held to be not protected. Facebook was, in effect, the architect of the whole discriminatory regime. And with that, I would reserve the balance. Thank you. You can take a second to get set up there, Mr. Boutros. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Theodore Boutros for Facebook. The district court correctly dismissed plaintiff's complaints for two independent reasons, no Article III standing in Section 230. The plaintiffs offer no plausible allegations that they suffered any actual concrete particularized injury. Counsel, are you familiar with a case called Reagan, R-A-G-I-N, from the Second Circuit? I didn't see it in the briefing. But in that case, the Second Circuit held that readers of a newspaper had standing to maintain an action under Section 804C of the Fair Housing Act, even if they weren't even in the market for housing. It's basically on all fours with respect to standing. And I wasn't able to find any case that was squarely on the other side. So it seems to me you're asking us to create a circuit split. And in particular, in this case, Ms. Vargas says that she was ready, willing, and able to move if she could locate suitable housing. And so she's, you know, in a stronger position than those newspaper readers in the Second Circuit. So why isn't there standing here? Your Honor, I don't think that case was cited. But based on the way the court outlined the facts, this case is easily distinguishable. Ms. Vargas – For the better for Ms. Vargas because she – they said there you didn't even have to want housing. And if you just saw these discriminatory ads, you could bring a lawsuit. And here she wants to move. She wants to find housing. Ready, willing, and able, she says. But there's no ad, Your Honor. There's no ad that she pointed to. There was no evidence or allegations. There's an absence of ads. That's correct, Your Honor. But – For discriminatory reasons. That's the allegation. I should note, Your Honor, not in the complaint, not in any of the settlements that they've cited, has anyone identified an actual discriminatory ad where these exclusion efforts were made. Not once. But let me just address this, Judge Gergen, because I think it's very, very important. Plaintiffs don't even allege that the housing that they sought existed. They don't allege that there were any ads in anywhere, not just Facebook, let alone on Facebook's platform. If she didn't see them, how would she know? Well, there are many other ways for her to search for housing. Apartments.com. There's Zillow. There's a whole universe of places to look for housing. And here Ms. Vargas says she was looking for a $1,700 a month three-bedroom apartment in lower Manhattan, which is a highly unlikely piece of real estate to exist. And there's – and to paragraph 95, which plaintiff's going to do, if Ms. Vargas – if her friend had received a search result with that property, those property characteristics, it would be in the complaint. And the inference is, from the very next sentence in the complaint, is that her friend did not get anything close to the specifications that she was seeking. So this is the kind of speculative chain of possibilities. There's not any allegation that the property existed with those specifications, that it was advertised. Well, if there were discovery, they might find such a thing, yes? Potentially. Well, Your Honor, I don't think so, Your Honor. And I think they had to go through a couple of other hoops, in the words of Iqbal, unlock the doors to discovery. Here, at most, they're alleging that it's possible that an advertiser could violate Facebook's policies against discrimination and exclude protected classes. Well, you know, I think for the purpose of our analysis, we have to take all the allegations as true, including those that discuss the lack of neutrality in the criteria. So I'm still puzzled by why discovery might not uncover the things that you assert are missing. First, Your Honor, the court does not have to take all the allegations as true. They're conclusory, speculative, and based on possibility. Well, they're not conclusory. This is a person who says, hi, I'm looking for housing. I'm ready, willing, and able. This is what I want. I sat side-by-side with this person. That's not conclusory. It's not speculative. It's very descriptive of the person's situation. It is as to her situation. But she didn't say, and my friend got ads that I didn't get that met my criteria, and I would have been willing to and qualified and been able to rent that housing. That's the kind of allegation that might have at least suggested discovery was appropriate. And let me address, Your Honor, this neutrality. Roommates.com, which they've relied heavily on, that was a housing-only website. Facebook's tools are neutral, and they apply to every type of product and service, dog food to housing, everything in between. I don't see how that helps you, because insofar as it applies to housing, if it's improper it shouldn't be used for housing, even if it can be used for dog food. Exactly, Your Honor. It would if any advertiser, and there's nothing in the record, Judge Graber, that any advertiser ever did this. There is no record. That's the problem. And this is on the complaint, which we have to take as true. Which is an even easier burden to meet. All they had to do was allege it. Find something in the public sphere that suggested that this was actually happening. This is totally hypothetical and totally conjectural. But on the neutral tools, Your Honor, that's what this court said in Gonzales. That's what it said in Roommates.com. If there are tools that are not required to be used, in Roommates, the Roommates questions required the users to give discriminatory answers based on protected conduct. And that's why, in Roommates, this court found that Roommates was a developer of the content under Section 230. Here, these were neutral tools that, in the words of Gonzales and Roommates, could be misused and used improperly. That's what they're theorizing. I've sort of jumped into the Section 230 argument, but it goes to standing as well. We have a traceability argument. And, Your Honor, I just want to back up. These were neutral criteria that could be used in totally legitimate ways, unlike Roommates.com. There's no allegation that they were ever misused, let alone as to Ms. Vargas. Paragraph 95 does not allege that these were paid ads. They don't even allege what the content of the ads that her friend received. They don't say they're paid or unpaid. It's total speculation that Ms. Vargas was subjected, or any of the plaintiffs, to any discriminatory conduct or discriminatory ads that excluded in the way the plaintiffs allege. And I do want to, on the Section 230 point, this is a very, very straightforward application of Section 230. As this court knows, and this court really is probably the leading jurisdiction in fleshing out the meaning of 230 and drawing the lines that need to be drawn, here there's no question that the cause of action hinges on the claim that Facebook published third-party content. That's it. Section 230 protections apply. And what they're complaining about is that Facebook disseminated the third-party ads, published them. They say it over and over in their complaint. And as this court knows, Section 230 is meant to allow platforms to police conduct and make editorial decisions about what content to allow to be posted and what content to take down and the like. And that's what is going on here. They're saying Facebook should not have published these ads. The ACLU and plaintiffs, to a certain extent, try to broaden this beyond the audience targeting tools to add delivery. That wasn't their argument below. It's not their argument today even. But the bottom line is that Facebook was publishing the third-party content. The advertisers developed the content. It's not like roommates.com where Facebook was requiring certain answers. The audience selection tools don't even need to be used. Not all advertisers use them. They also are not to be used for discriminatory purposes in violation of the company's policies. And that's what this court said in Google, Gonzales v. Google, that if there's a neutral set of tools and algorithms that could be misused by a bad actor, but that's not encouraged, and here it's not encouraged because the policies forbid it, or let alone required, as in roommates.com, then that's third-party content. And so those ads are third-party content, and Facebook is simply publishing them. The Duroff case from this court involving the heroin sales that resulted in the death of a young man, there the court said even though the platform sent email notices and put people together, including the people in the heroin transaction, those were neutral tools that could be abused, and yet that did not take away Section 230 protection. The Carafano case where there were multiple-choice questions that were given to the users to answer that could then be combined and used to put people together, that did not take away the Section 230 protections because they were neutral tools that didn't push the platform into the development of content like in roommates.com. So I think the Section 230 issues are very, very straightforward. And I want to go back to standing, Judge Graber, because I hear what you're saying. You're concerned that someone who's actually injured might not have a remedy, and I get that. And we get that there's a certain, to a certain extent, this counsel makes the point that Facebook does have some information that's not available to the plaintiff, and in some circumstances there's jurisdictional discovery that can be allowed, usually in the personal jurisdiction context. But here it dovetails with the actual merits of the case. Injury, it's very rare for a court to say you can file a complaint when you don't know if you've actually been injured and then get discovery. Iqbal, this court's decision interpreting Iqbal and Tuomly, say you can't come in with speculation about something that's possible and then unlock the doors to discovery. That's from Iqbal. That's what they're trying to do here. Also, the plaintiffs appointed to these settlements, but that should give the court comfort. There was a way when Facebook learned through these suits and the fake ads that ProPublica submitted to see if they could get them through, Facebook settled that first case and changed its system. And that's what Section 230 is really meant to do. So here's a question, since you pointed to the settlements. Is this a case that would benefit from mediation? I don't think so, Your Honor, because we've had two settlements on these issues, and there's no evidence of any actual injury. Those are in other cases, not this case. And in mediation, one can go beyond the legal strictures to learn more about what's going on. Your Honor, I'm always supportive of ways to resolve cases, but here we've had a settlement with the federal government, a settlement with the ACLU and NAFTA that created a separate housing platform for ads that eliminated the possibility that advertisers could misuse the platform. And there's no evidence that anyone here suffered any actual concrete harm. And plaintiffs point to the fact that transunion involved the trial. We cited transunion for the principle that there must be injury in fact to give article 3 standing, not injury in law, and the possibility that the law was violated. Well, what's interesting, though, is that cases like Havens and Reagan recognize injury from the fact of having discriminatory advertising in existence that is stigmatizing to the individuals. And if that is a cognizable injury, then they have been injured, have they not? No, Your Honor. Havens really supports us because there were two testers in Havens. One tester went to a place and was lied to and told, there is no housing available for you, the black tester. Right. But in Reagan, it's this very section of the Fair Housing Act that's involved, and all it required was that someone see and be offended by discriminatory advertising. And what paragraph 95 says is, I saw the results of discriminatory advertising when I sat side by side with this person. It's basically the same as Reagan. Your Honor, it does not say that. It says that her friend ran a search, and the search produced more better locations or preferable locations. For the exact same criteria. Correct. So, anyway. But if I can just, because I think it's an important point, Your Honor. The big difference in the Reagan case is the Second Circuit case. Yes. So we may want to do a 28-J on that just to address it for the Court because I hear what you're saying, Your Honor. But it's very different here. And just to go back to Iqbal, and maybe I'll finish with this point. Iqbal and this Court's decisions interpreting it say if there are two possibilities. The plaintiff says, I think this was the result of discrimination. But if there are other possibilities that are lawful and innocent explanations. Yeah, what's the innocent explanation for two people sitting side by side at the same time using identical criteria? Is there an innocent explanation for that? First of all, there's no, we don't know if they were paid or unpaid ads. Unpaid ads would not use the, they're not subject to the audience selection tools. Paid ads, as plaintiff's own complaint alleges for pages, there are all sorts of interest and factors that go into the information that the user would see. So there are all sorts of explanations, totally legitimate reasons why different ads might have come up for a different user. And the one other point I want to make before I sit down, this data was not based on race, it was based on interest. So if someone clicked on particular things, that's how it would go into that sort of group. And so I do think, Your Honor, that this is so different from a case where we know there's a discrimination and a discriminatory act, and someone's exposed to it, and there's a barrier that stands in their way. Here, there are all sorts of innocent explanations, and plaintiffs did not submit facts, specific facts that nudge it from a sheer possibility to a plausible allegation that creates Article III standing. Thank you very much. Thank you, counsel. And after opposing counsel is finished, I will read out some citations that you both may want to take a look at and consider for a 20-AJ letter. Thank you. Thank you so much. You got it. Your Honors, defense counsel did not respond to two adequate bases for two different bases of standing. One, exclusion of ads. Vargas experienced that. She saw fewer ads. And the fact that this was on Marketplace is irrelevant. If we look at their lower court brief at ER 51 and 52, they admit that housing on Marketplace is also populated with paid ads. The inferences is that Marcello received paid ads that were barred from Vargas because she was Hispanic, a woman, disabled, and with children. Counsel wants to conduct a mini-trial here on whether there are other explanations, but that's not the law. This is a standing issue. The plaintiff was not required to show whether there were innocent explanations that were negative or could be ruled out. She was only required to show that she was excluded. She wasn't required to show what housing was excluded. She wasn't required to show that she was even ready, willing, and able and would have wanted that housing. She wasn't required to show that she could have gotten a mortgage to buy the housing. She only had to show that she was excluded. We did that. Counsel, if I could just jump in, and if I need to give you a little more time, I will. Because on the issue of jurisdictional discovery, what questions would you propound to Facebook if you wanted to bolster Paragraph 95? What would you be seeking? We would be asking for ads that were shown and not shown to our plaintiffs during the relevant period of time. We'd be asking them for their advertiser files, and they keep extensive files. They receive $85 billion a year in advertising revenue, so they've got to have this information. What advertiser advertised in their jurisdiction, what parameters they had, what ads were shown to other people around where our people lived. So there would be a lot of relevant discovery. But I would say, Your Honor, based on the current status of the law, I do not believe that we needed to go further for discovery. Understood. And the second basis of discovery that he didn't even respond to is misrepresentation. Counsel, we have a question for Judge Murphy. I apologize, Your Honor. Opposing counsel suggested it was necessary for you to allege that the friend received an ad that the plaintiff didn't. Is that so? Yes, and, Your Honor, we did allege that. We allege that. They put in the exact same searches, and our client, Ms. Vargas, received fewer ads and fewer desirable ads than her white friend received. So it was just a count? You pointed to no specific ad that the friend received that your client didn't? I'm sorry, Your Honor, I don't understand the question. The question, I think, is whether you had to plead precisely which ads, you know, the following five paid ads were received by the friend but not by the plaintiff. Is that your point, Judge Murphy? Yes. Under Havens, we were not required to show which ads we didn't receive or which ads we might have been interested in. Well, let me, you did have knowledge of what ads did the friend receive, right? Yes, our client experienced that. It would be a very easy thing to allege that there was a specific ad about a specific housing that the friend received that your client didn't receive. Your Honor, at the time this happened, our client didn't know she had a claim. She didn't save those ads, and we don't have those ads. She knew her friend, and she knew she could easily know what ads the friend received. But, Your Honor, she does not recall those today. And that's, we don't have the actual ads that Marcello received, but we would submit that under the law that's not required. We were excluded because of race and other protected characteristics, and that should be sufficient. So couldn't your proposed discovery be more targeted than what you suggested, and that is you just want to see the ads in this category that Marcello received and the ads that your client received? Your Honor, if the case is remanded for discovery, I wouldn't want to limit our discovery because if we're required to engage in this endeavor, we would want to— But if you say that you have to allege this, and that limited discovery shows that there are no such ads, then it doesn't matter what the other discovery would show. Isn't that correct? No, Your Honor. All of our plaintiff's experience is relevant, and we would want to have discovery on all of their experiences and what ads weren't shown to all of the several plaintiffs. But again, Your Honor, I don't believe under Havens that we need to go further and prove which specific ads we weren't shown. And I would say there's a second basis for standing that was not even touched. There were two misrepresentations here, that Ms. Vargas, these are all the ads available, and two, we don't discriminate and we don't allow discrimination when they do. And that alone is standing under Havens and the case law and under the statutes. My time is up. Do I have additional time? Well, let me just ask you this.  Since you asked Mr. Boutros, we want to give you the same opportunity. What would you think about that in light of the question to opposing counsel? Your Honor, we're always willing to engage in that endeavor. Do you think it would be fruitful? I don't know. Fair enough. That's a fair answer. Do you think it would be plausible? I'm not sure. Why don't you take a minute just to wrap up. Thank you, Your Honor. Then turning to Section 230, 230 is not remotely met. Facebook co-created the content, worse and more egregious than in roommates. It data-mined its people. It knows people didn't have to input their race, religion, sex, or national origin. It already knows that, so that's a non-sequitur. And then it was the ad messenger and the ad blocker. And even if it just co-created, Hayven says, I'm sorry, Roommate says that's enough. At page 1165, the court said, quote, the fact that users are information content providers does not preclude Roommate from also being an information content provider by helping develop, at least in part, the information in the profiles. That's what happened here. I would point out that the agency with expertise in this area, HUD, doesn't believe that Facebook is protected by Section 230. Thank you very much. Thank you, counsel. Thank you both for your fine briefing and argument in this case. This matter is submitted, and we are adjourned.
judges: Murphy, GRABER, OWENS